Filed 2/9/21  In re D.H. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re D.H., et al., Persons Coming Under the Juvenile Court Law. | B304553 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>J.H.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. Nos. 19CCJP08271 19CCJP08271B, 19CCJP08271C) |
| In re K.C., a Person Coming Under the Juvenile Court Law. | B305896 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>J.H. et al.,<br><br>    Defendants and Respondents. | (Los Angeles County Super. Ct. Nos. 19CCJP08271, 19CCJP08271A, 19CCJP08271B 19CCJP08271C) |

APPEAL from orders of the Superior Court of Los Angeles County, Craig S. Barnes, Judge. Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Appellant, Defendant and Respondent, J.H.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff, Appellant and Respondent.

Pamela Deavours, under appointment by the Court of Appeal for Defendant and Respondent, C.V.

## INTRODUCTION

Father Jose H. appeals findings of jurisdiction over his two sons under Welfare and Institutions Code section 300, subdivision (b)(1),[1] and related disposition orders. Father's 11-year-old stepdaughter, K., stated that father engaged in inappropriate behavior that included randomly slapping her buttocks, and touching her leg and buttock while she slept. The Los Angeles County Department of Children and Family Services (DCFS) filed a petition seeking jurisdiction over all three children on the basis that father sexually abused K., and the children's mother failed to protect them. The juvenile court held that father's actions did not support a finding of sexual abuse under section 300, subdivision (d), amended the language of the petition to state that father made "inappropriate contact and failed to recognize appropriate boundaries," and sustained jurisdiction for all three children under section 300, subdivision (b)(1). Both father and DCFS appealed, and we consolidated the appeals.

_____

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

In his appeal, father does not challenge jurisdiction as to K., but he asserts that substantial evidence does not support a finding of jurisdiction over his sons because his treatment of K. did not place the boys at risk. We find that substantial evidence supports the jurisdiction order. Father further asserts that the juvenile court erred in its disposition orders by removing the boys from his care, requiring monitored visitation, and requiring father to complete a sexual abuse education program for offenders. We find no error in the court's disposition orders.

DCFS asserts in its appeal that the trial court erred in amending the petition to remove allegations of sexual abuse, because the evidence supported a finding that father's treatment of K. amounted to sexual abuse. In light of the high burden on such an appeal—requiring a showing that the court was compelled to make such a finding as a matter of law—we find that DCFS has not met its burden. We therefore affirm the jurisdiction and disposition orders.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A. Detention**

On December 5, 2019, DCFS received a referral for general neglect and sexual abuse. The referral stated that after K. turned 11 years old in March 2019, father (K.'s stepfather) "has slapped her on the butt about 5 times" over her clothing.[2] About three months earlier, K. woke up to find that father was rubbing his hand up her leg. The reporter stated that when K. told mother about that incident, "her mom said she was just having a dream." When K.'s grandmother witnessed one incident, she "kicked [father] out of the home," but mother "allowed him to

---

[2]Mother reported that she and K. did not have a relationship with K.'s father. He is not a party to this case.

3

move back in the home." K. stated that she felt safe at home because her grandmother was there, but "[K.] reported her grandmother and mother have been fighting so her grandmother may be moving out of the home, possibly today."

A children's social worker (CSW) went to K.'s school and spoke with the school psychologist and principal. The psychologist stated that K. was brought into his office on November 22, 2019 because she had been cutting herself on the arm with scissors. K. attributed the cutting to problems with father. K. stated that father makes her do a lot of chores around the house, and mother always sides with father. K. denied that anyone touched her inappropriately.

When the psychologist asked K. again on December 4, 2019 if anyone touched her inappropriately, K. said "yes," and reported that father had slapped her on the butt five times. K. said she did not tell the psychologist earlier because she was "scared about what will happen to her family." K. said it feels "inappropriate" when father slaps her, and "the way he ([father]) looks at her is wrong." K. stated that on one occasion, father purposely "threw [K.'s] clothes on the floor in order for [K.] to bend over and he slapped her buttocks." K. also told the principal that "3 months ago [father] rubbed her leg up to the buttocks" while K. was asleep. When K. told her mother about it, mother asked if she was dreaming. K. said she felt safe in the home when maternal grandmother was there, but if maternal grandmother moved out, K. would be alone with father five nights a week while mother worked. The psychologist told the CSW that he was concerned father "will continue to do this. I don't know how far it has gone. It feels inappropriate thus far."

4

The CSW spoke with K. on December 10, 2019. K. reported that she lived with mother, father, and her two half-brothers (father's sons), five-year-old D. and one-year-old J. Maternal grandmother had moved out of the home. K. told the CSW that father "randomly" spanks her on the buttocks when she walks by him, which is "uncomfortable." K. said that father did not spank her when she was younger, "but now that I'm bigger, he started doing it." K. felt that the spanking was done "in a sexual manner." K. reported that in August 2019, she had been asleep when she felt father "rub from the bottom of her leg up to her buttocks; [K.] stated she was wearing small shorts when this occurred. [K.] stated she woke up and slapped his hand as he was rubbing her buttocks." Father asked why K. had slapped him, and K. responded that it was because he was touching her. K. said she began crying because she did not know what to do. When mother came home and K. told her about the incident, mother asked K. if she had been dreaming. When mother saw that father's hand had red marks from K.'s rings hitting him when she slapped him, mother kicked father out. Father began visiting the home again between August and November 2019, however, and moved back into the home in November 2019.

K. told the CSW that she started cutting herself after father returned to the home and father "wouldn't leave me alone." K. said father "would continuously tell her to do chores 'again and again' while she was doing her homework." K. said father did not make sexual comments to her, but three times he had looked at her "from head to toe" in a way that made K. uncomfortable. K. said she told mother about it, and mother told father to stop. K. said she was "scared" that father would attempt to touch her again.

5

The CSW spoke with five-year-old D. at his school. The CSW noted that D. had a speech delay, his speech was limited, and he conveyed some information through gestures. D. said mother and father discipline him by spanking with an open hand. D. "stated his father 'hits' him 'hard.'" D. denied being afraid of mother or father. He also said he never saw father spank K. D. said he had never been touched inappropriately. The CSW also observed one-year-old J. and did not note any concerns.

The CSW visited the family's home and spoke with mother. Mother said she did not spank the children, but she did not know how father disciplined the children while she was at work. Mother said her eight-year relationship with father had its "ups and downs," but she denied that they had any physical altercations in front of the children. Mother said that father sometimes cursed at the children, and she "needs to work on how he talks to me and the kids." Mother was aware of K. cutting herself, and said K. did it "due to needing 'attention.'" Mother was not aware of any other incidents in which K. cut herself.

Mother said K. had just told her that day that father spanked her buttocks and it made her feel uncomfortable. The CSW asked mother if K. told her about father touching her leg and buttocks while she was asleep, and mother initially said, "I don't know." Then mother recalled that K. said something about father touching her leg, but father had denied it. Mother stated that father "wouldn't do that," and she wanted to know "both sides" of the story. Mother said K. told her about the incident two or three weeks after it occurred, and mother said she did not kick father out of the home based on the incident. Mother said she told K. not to wear shorts when she sleeps.

6

Two CSWs later spoke with father at the home. Father told the CSWs it was the first time he was hearing about K.'s allegations. But he also said that he had already told mother that he did not touch K. When one CSW "asked how this came up as [father] previously reported not ever hearing about any sexual abuse," father was "evasive but stated that [K.] had previously accused him of touching her while she was sleeping." Father denied any touching, and said that because he never slept in the bedroom, he could not have touched K. Father also told the CSWs that "he was sure allegations were coming from maternal grandmother," because he is Mexican and she is prejudiced against Mexicans. Father stated that maternal grandmother "puts things in [K.'s] head, like that I'm not her father and things like that."[3] Father also said that K. did not want him in the home because "he is strict with her and tries to make her do chores."

The CSW also spoke with maternal grandmother on December 10, who "reported that she did have concerns about inappropriate behavior towards [K.] from" father. Maternal grandmother said that when she was at the home about a month earlier, she heard a slap sound from kitchen, where K. and father were. Maternal grandmother later asked K. about the sound, and she said father spanked her on the butt. Maternal grandmother said father did not say anything at the time, and K. was not misbehaving. K. told maternal grandmother that father "always does that." Maternal grandmother told the CSW that she "felt this was inappropriate as [K.] is a young lady and it is

---

[3]Father spoke with the CSW in Spanish; this quote is the English translation of father's statement as it is written in the detention report.

7

not okay for her to be spanked on the butt by a man." When maternal grandmother spoke with mother about it, mother accused maternal grandmother of misinterpreting the situation.

The CSWs and the family agreed on a safety plan to have K. stay with a neighbor and ensure no contact between K. and father. DCFS stated that the "family can be categorized as being at 'High Risk' for future abuse due to [father] sexually abusing [K.], [father's] lack of insight, and the young age of the children." The detention report also stated that "there are concerns of at risk [*sic*] sibling abuse of children [D.] and [J.] as the children are at such young and vulnerable ages, where they are unable to protect themselves from any abuse and/or neglect." DCFS noted that father was the only adult at home with the children in the evenings, and he "has a lack of insight and recognition there is a problem which places the children [D.] and [J.] at risk of suffering emotional or physical harm." DCFS then obtained a removal order that included D. and J. Father agreed to leave the home, and maternal grandmother moved into the home to help care for the children. DCFS noted that mother was "willing to receive services, comply with court orders and to protect the children."

DCFS filed a petition under section 300, alleging one count each under subdivisions (b)(1) (section 300(b)(1)), (d) (section 300(d)), and (j) (section 300(j)). Section 300 states that jurisdiction over a child is appropriate when the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child" (section 300(b)(1)); when the child has been sexually abused or there is a substantial risk that the child will be sexually abused (section 300(d)); or if the child's sibling has

8

been abused or neglected (section 300(j)). The three counts in the petition—count b-1, d-1, and j-1—each had identical language alleging that father "sexually abused [K.] by slapping and fondling the child's buttocks.  On a prior occasion, [father] rubbed and fondled the child's leg to the child's buttocks."  The three counts further alleged that mother "knew of the sexual abuse" of K., allowed father unlimited access to K., and failed to protect K.  The petition alleged that father's sexual abuse of K. and mother's failure to protect placed all three children at risk of physical harm and sexual abuse.

At the detention hearing on December 31, 2019, father requested a home-of-parent order for D. and J., stating that there was no risk to them.  Minors' counsel opposed father's request, noting that the alleged touching while K. slept "took place in the room where they were all sleeping together," which "shows a disregard to the fact that his younger children were also present in the room."  Counsel for DCFS agreed "that the sexual abuse took place in the presence of the other minors," and requested that father's visitation with the younger children be monitored.  The juvenile court found a prima facie case for detention, and ordered that the children be detained from father and remain in the home of mother.  The court ordered monitored visitation for father with D. and J., and ordered no contact between father and K.

**B.    Jurisdiction and disposition**

The jurisdiction/disposition report dated January 31, 2020 stated that the three children were living with mother.  K. confirmed her earlier allegations about father slapping and touching her.  Mother told K. she believed her, which made K. feel supported and safe.  D. stated that he never observed father

spank or touch K.  D. denied any inappropriate contact involving him.  J. was too young to give a statement.  Maternal grandmother confirmed that she heard father slap K. from the other room, and said she was not aware of any other inappropriate conduct by father.

Mother said that K. told her about the incident in which she awoke to find father touching her just after it happened, and in response, mother made father leave the house that day. Mother and father said that they had been separated since March 2019, but father had continued caring for the children while mother worked in the evenings.  Mother said she did not intend to reunify with father, but she wanted him to maintain a relationship with D. and J.

Father denied ever touching K.'s legs.  He admitted slapping K. on the butt three times in one day, but said it was playful, not sexual. Father said he was disappointed that K. misinterpreted his actions, and suggested that she "made up lies because she is sad she doesn't get attention like" D. and J.

DCFS recommended that the petition be sustained and the children be declared dependents of the court under section 300(b)(1), (d), and (j).  It also recommended that mother be provided family maintenance services, including a parenting program, individual counseling, and a sexual abuse awareness program.  DCFS further recommended that father be provided enhancement services including a parenting program, individual counseling, and a sexual abuse program for perpetrators.

Before the disposition hearing, father submitted a trial brief asserting that even if the allegations regarding K. were found true, there was no "nexus between the allegations and substantial risk to father's biological children," D. and J.  DCFS

filed a response, asking the court to find jurisdiction over D. and J. under section 300, subdivisions "(b), (d) and/or (j) as the court deems appropriate."

The jurisdiction and disposition hearing was held on January 31 and February 3, 2020. K. testified in chambers. K. said that after she turned 11 years old, father got into "a habit . . . of slapping me on my butt randomly." K. recounted an incident in which father threw K.'s clothing on the floor, and when she "turned around and bent over" to pick the clothes up, "he slapped me." K. said, "I was, like, why? Because there was no reason." K. said father never slapped her in front of other family members, "but my grandma did hear once when we were in the kitchen." K. said father told her once not to tell mother that he slapped her butt; K. said she told mother anyway. K. also testified that she was always clothed when father slapped her.

K. testified that in another incident, "I was sleeping, and I woke up to his hand rubbing my leg, like, it was going up my leg." K. said father's hand moved from her ankle to the right side of her buttocks. K. woke up and hit father, and a ring on her hand left a mark; father then asked K. why she hit him. K. said she "was upset because he was touching me," and told mother when she came home. Father did not do that again. K. testified that her brothers were on the bed at the time of the incident.

K. testified that in another incident about a month later, she had been watching television in the bedroom, and she got up to use the restroom. When she returned to the bedroom, father "grabbed me and threw me on the bed. He was on top of me, and I bit him." K. testified that father was on his knees over her, and she bit father on his right shoulder through his t-shirt. Father began yelling at K. for biting him; J. was asleep on the bed at the

11

time, and he woke up when father began yelling.  D. was also in the bedroom at the time.  When mother came home and saw the mark on father's shoulder, father told mother that something hit him at work.  K. then told mother that she bit father after he threw her on the bed.

K. testified that she spoke with the adults at her school because after father came back to the home, she "was scared he was going to do something more."  K. stated that she had started cutting herself on her arm because "I was stressed out, and I was scared."  K. stated that mother kicked father out of the house multiple times in 2019.  K. said that "there was always times when [mother] would kick [father] out; he'd come back. So it was just like that."

Father testified that at the time of the biting incident, mother had an emergency relating to her asthma and needed to go to the hospital; father left work to care for the children while mother went to the hospital with maternal grandmother.  Father and K. got into a disagreement over which television channel to watch and whether K. could use father's phone.  Father testified that K. physically tried to take the remote control from him, and when she could not get it, she bit him on the left side of his chest near his shoulder.  Father testified that D. and J. were in the bedroom at the time; J. did not wake up and D. did not react.  Three days later, mother saw the bite mark and asked what happened; father said he got injured at work.  Father said he told mother this so K. would not get punished.  Later, mother confronted father with K.'s version of the story—that father had gotten on top of K.—and father said that was not true.

On cross-examination, father admitted that he slapped K.'s buttocks, but said he was only "playing around."  Father

explained that while playing tag, K. "smacked me on the butt. I thought we were playing around, so I hit her twice. We kept playing and I think the third time I hit her, she got upset." Father said he did not recall hitting K. when maternal grandmother could hear it. Father also denied touching K. while she was asleep.

Counsel for DCFS argued that K.'s testimony was credible, and there was sufficient evidence to sustain the petition as it related to K. As to the other children, counsel for DCFS asserted that the boys were present when father acted inappropriately with K., and asked that the court find jurisdiction under section 300(b)(1), (d), or (j). Minors' counsel asked the court to sustain the allegation under section 300(d) based on K.'s testimony. Minors' counsel also asked the court to sustain the petition as to D. and J. because they were in the room at the time the incidents occurred.

The court noted that the other children were asleep during the incident in which K. woke up with father touching her leg, and asked, "How should the court analyze the (j) count?" Minors' counsel stated that "[f]ather's behavior is brazen," and he always gave an alternative explanation to K.'s story. Minors' counsel also stated that the court was not required to wait until father's behavior worsened before taking jurisdiction over the children.

Father's counsel argued, "[T]his is not a (d) case. This is a story about a child not liking her stepfather." Father's counsel noted that K. said she did not want father in the home, and "the desire to not have the stepfather in the home is the driving force in this case." She asserted that K.'s allegations did not amount to sexual abuse. Father's counsel argued that DCFS was required to show that the Penal Code had been violated before the court

13

could sustain an allegation under section 300(d), and asserted that there was no indication that father was motivated by sexual gratification. The court asked father's counsel, "Well, would it be anything other than sexual gratification to go into the room at night, put your hands on the leg all the way up to [the] buttocks? Is there a legitimate purpose other than that?" Father's counsel suggested that perhaps father was simply waking K. by touching her leg. Father's counsel also argued that there was insufficient evidence to sustain the count under section 300(j) as it pertained to D. and J. Father's counsel argued that D. and J. "have been appropriately cared for and have not had any inappropriate contact, abuse, or even neglect from the father." Mother's counsel asked that mother be stricken from the petition, or that the petition be amended to state that mother was unable to protect the children due to her financial reliance on father.

The court took the issue under submission and ordered the parties back the following court day, Monday, February 3. On that day the court stated its decision on the record, noting that there had been "[o]ne touch to the leg and buttocks, five slaps to the buttocks, [and] the biting incident . . . . [I]s this egregious? No. Is it appropriate? No." The court noted that father slapped K. "so hard" one time that maternal grandmother could hear it in the other room, and "[t]hat does not sound as if he's doing this for sexual arousal, but instead something else is going on in terms of his conduct, which I can only describe as being inappropriate and the kind of conduct that suggests that he doesn't recognize proper boundaries. But I think it's a bit of a leap to say this is a (d) count; it's not."

The court then discussed whether there was a risk to D. and J., stating, "I think that there's a risk, but not the risk that is

14

referenced in *I.J.*,[4] which talks about the risk of sexual abuse, but risk that he does not recognize that there's a point in the children's age when what he may think is appropriate becomes something inappropriate.  So with all of that considered, the court is going to dismiss the (j) count – I don't think the totality of the circumstances supports that – as well as the (d) count. But the (b) count needs to be amended because I think what we have here is inappropriate contact with this minor, who is 11, and father not recognizing appropriate boundaries."  The court continued by noting that some of father's inappropriate behavior occurred in front of D. and/or J., which was "concerning about whether he recognizes what those boundaries should be. And I don't know that he would necessarily recognize it any better between biological and non-biological."  The court also stated that it would be appropriate to sustain the (b) count as to mother, because mother left the children with father even after she knew father and K. were having issues.

The court therefore sustained the petition under section 300(b)(1), amended to state, "On October 2019 and on prior occasions [father] made inappropriate contact and failed to recognize appropriate boundaries of the child [K.] by slapping the child's buttocks and touching the child's leg in an inappropriate manner.  The mother knew of the inappropriate contact and failure to recognize appropriate boundaries of the child [K.], mother and [father] failed to protect the child in that mother allowed [father] to provide child care and have unlimited access to the child.  The inappropriate contact and failure to recognize appropriate boundaries of the child [K.] by [father] and the mother's failure to protect the child endanger the child's physical

_____

   [4]*In re I.J.* (2013) 56 Cal.4th 766 (*I.J.*).

health and safety and place the child and the child's sibling[s], [D. and J.,] at risk of physical harm, damage, danger and failure to protect."

The court proceeded to disposition.  Father's counsel asserted that father should not have to complete a program regarding sexual abuse for perpetrators. Father's counsel also asked that the court enter a home-of-parent order for father as it related to D. and J., or that father have unmonitored visitation with D. and J.  The court said, "I'll tell you what my concern is: I found inappropriate contact."  The court noted that father's behavior "was percolating," and stated, "My concern is not just [K.], but the two other children, and understanding what's in bounds and what's not in bounds. . . .  I don't want to ignore the issue and have it become a situation that years down the road . . . father engages in similar conduct."

The court asked DCFS's counsel for his thoughts, and counsel stated, "I'm not sure what to make out of the court's ruling as far [as] whatever it is [K.] said happened in that bedroom when he came in; she said he touched her leg all the way up to the butt.  How that can be anything other than sexual contact[?]"  The court interrupted, and stated, "I'll tell you why. Because I found disparities in both of their versions that made it may [*sic*] hard to reconcile," and DCFS had not met its burden on the issues where the parties' testimony disagreed.  Counsel for DCFS stated that he understood, and said, "[T]he department's recommendation for the [sexual abuse] program is, I think, consistent with the court's ruling."  The court responded, "I agree."

Mother's counsel stated that she did not oppose the home-of-parent order for father.  Minors' counsel stated that K. did not

16

want "to keep her brothers separate from their dad," and counsel would have no objection to a home-of-parent order for father "as long as father is participating in the programs that the court is ordering." Minors' counsel also asked that father be ordered to complete a sexual abuse education program, but "whether that necessarily has to be labeled 'for perpetrators,' I'll leave that to the court."

Father's counsel again asserted that father should not be ordered to enroll in a program for sexual abuse perpetrators, and asserted that father's issues with "inappropriate boundaries" could be addressed through parenting classes. Father's counsel stated that the court was "wondering is there going to be some kind of problem with the boys," and stated that there was "no evidence" of an issue. The court stated that the biting incident "happened in front of one of his children. That's a cause for concern." Father's counsel noted that "the boys are attached to father," and the court responded, "That doesn't allay the concern; it heightens it in many respects. Because it normalizes behavior that I found inappropriate."

The court held that placing D. and J. in father's home would be contrary to the children's welfare. The court found by clear and convincing evidence that there would be a substantial danger to the physical health, safety, and well-being of the children if they were returned to father's care. The court therefore ordered that the children remain in mother's home, ordered that father's visits be monitored, and allowed DCFS discretion to liberalize visitation. The court ordered father's case plan to include sex abuse counseling for perpetrators. Father

17

timely appealed.  DCFS also timely appealed.[5]  We granted DCFS's request to consolidate the two cases.

## DISCUSSION

In his appeal, father does not challenge jurisdiction under the amended b-1 count as it pertains to K.[6]  However, he asserts that the court erred in four respects:  (1) by exercising jurisdiction over D. and J. due to finding of a serious risk of harm, (2) by removing D. and J. from father's custody, (3) by requiring father's visitation with D. and J. to be monitored, and (4) by requiring father to participate in sexual abuse counseling for perpetrators.

In its appeal, DCFS asserts that the trial court erred by amending the b-1 count and dismissing the d-1 and j-1 counts.  It contends that the court's questions and statements at the jurisdiction and disposition hearing made clear that the court found that father's treatment of K. constituted sexual abuse, and therefore that the case issues to be addressed include sexual

---

[5]Mother did not appeal. In her respondent's brief to father's appeal, she states that she joins the contentions asserted in DCFS's appeal.

[6]Father makes clear in his opening brief that his appeal "only concerns [D.] and [J.]," not K.  Nonetheless, in his respondent's brief filed in DCFS's appeal, father asserts that he "maintains that the dependency petitions should have been dismissed in their entirety," and argues there was insufficient evidence to show "that any of the children were at substantial risk of serious physical harm, as required under section 300, subdivision (b)(1)."  A jurisdictional finding may not be challenged by way of a respondent's brief in another party's appeal; father forfeited any such argument by failing to raise it in his opening brief.  We therefore treat jurisdiction over K. as conceded.

18

abuse.  DCFS asks that the matter be remanded with directions to sustain the petition as alleged.

We address father's contentions first, then DCFS's.  We find that neither party has demonstrated error, and affirm the jurisdiction and disposition orders.

## A.  Father's appeal

Father asserts that the juvenile court's jurisdiction and disposition orders were not supported by substantial evidence.[7] "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.""'" (*I.J., supra*, 56 Cal.4th at p. 773.)

1.  *Jurisdiction over D. and J.*

Father asserts that there was insufficient evidence to support the court's finding that D. and J. were at risk of serious physical harm.  Father contends that "it was not shown that [D.]

_____

[7]DCFS asserts that father challenges the facial sufficiency of the amended petition, but that his contention is forfeited because he did not challenge the petition in the juvenile court.  In his reply brief, father makes clear that his challenge is to the sufficiency of the evidence supporting the court's orders, not the facial sufficiency of the petition.

19

and [J.] were at risk of serious physical harm as a result of any merely inappropriate behavior between Father and [K.].”

As noted above, jurisdiction under section 300(b)(1) is appropriate when the “child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child.” (§ 300(b)(1).) “[T]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citation.] The court may consider past events in deciding whether a child presently needs the court’s protection. [Citation.] A parent’s ‘“[p]ast conduct may be probative of current conditions” if there is reason to believe that the conduct will continue.’” (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.)

Father asserts that there was “no evidence whatsoever” that his “making inappropriate contact and failing to recognize appropriate boundaries with [K.] caused [D.] and [J.] serious physical harm, or placed the boys at substantial risk of serious physical harm.” Father asserts that “[K.] herself did not suffer a serious physical harm” because father’s  spanking her only made her “uncomfortable,” but did not hurt her.

We disagree that there is no evidence of a serious risk of harm. First, with respect to K., father ignores the fact that K. came to the attention of school staff, and ultimately DCFS, because she was  cutting herself with scissors, which she attributed to the stress of being exposed to father’s inappropriate touching. K. told the social worker and school staff that she felt safe in the home when maternal grandmother was there, and that she did not feel safe with father. K. also told the CSW and

20

court that when she awoke to find father touching her buttocks, she hit father hard enough for her rings to leave marks on him, and that she cried and told mother about the incident. K. testified that when father grabbed her and pinned her to the bed, she bit his shoulder hard enough to leave a mark. Thus, the evidence shows that when K. was exposed to father's inappropriate behavior, she was distressed enough to harm herself, to seek help from other adults in her life, and to attempt to defend herself with force. Moreover, "[i]t may be inferred from the fact of a lewd touching that the victim suffered serious physical harm." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 398.) Although the court found that father's behavior did not quite rise to the level of a lewd touching, it was not obligated to wait for further physical harm to occur before finding that K. was at risk.

As for the younger children, the evidence demonstrated a risk of harm to them as well. "'[C]ases finding a substantial physical danger tend to fall into two factual patterns. One group involves an *identified, specific hazard* in the child's environment — typically an adult with a proven record of abusiveness. [Citations.] The second group involves children of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety.'" (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766-767.) The evidence here supports both patterns. The trial court found that father's behavior with K. was inappropriate enough to support jurisdiction as to K., and father has not challenged that finding on appeal. K. testified that D. and J. were present when father touched her while she slept and during the biting incident. Exposing children to a situation in which one sibling is being touched inappropriately by an adult, causing that child to feel the

21

need to defend herself with physical violence, places small children at risk of harm.

Furthermore, father's inconsistent statements to the social worker about K.'s accusations (for example, saying he had never heard of the accusations, and then saying he had already denied them to mother), his failure to acknowledge that he breached appropriate boundaries with K., and his lie to mother about the bite mark on his shoulder indicated that father was not able or willing to address the issues that led to DCFS involvement.  In addition, D. told the social worker that father hits him "hard," indicating that father might already be breaching appropriate boundaries with D.  Moreover, D., age five, had a speech delay that made it difficult for him to communicate in words, and J., age one, was too young to report any inappropriate behavior.  The boys were therefore of "tender years," and unsupervised care by an adult who failed to recognize appropriate behavioral boundaries with children placed them at risk of harm.  (See, e.g., *In re Christopher R., supra,* 225 Cal.App.4th at p. 1219 [children six years old or younger are of tender years].)

We therefore find that substantial evidence supported the juvenile court's finding of jurisdiction over D. and J.

2.      *Disposition orders*

Father further contends that the juvenile court erred in its disposition orders by removing D. and J. from his care, requiring monitored visitation, and requiring father to complete a program for sexual abuse perpetrators. We find no error.

a.      Removal of D. and J. from father's care

"[A] dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a

22

substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child (detriment finding). (§ 361, subd. (c)(1).)" (*In re D.B.* (2018) 26 Cal.App.5th 320, 328.) "[A] child does not need to be harmed before being removed from his parents' custody. One of the goals of dependency is to protect a child before the harm takes place." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 918.) We review the juvenile court's finding of detriment for substantial evidence. (*In re B.S.* (2012) 209 Cal.App.4th 246, 252.)

Father's challenge to the court's order removing D. and J. from his care rests on the argument that there was no substantial evidence to support a finding that the children were at risk of harm. He contends that the court's detriment finding was "pure speculation," because there "was absolutely no evidence that Father had directly harmed or engaged in inappropriate behavior with his sons." However, "[t]he jurisdictional findings are prima facie evidence the minor cannot safely remain in the home." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135.) As discussed above, the jurisdictional findings were supported by substantial evidence.

In addition, DCFS stated in its disposition report that the "family can be categorized as being at 'High Risk' for future abuse"; it expressed concerns about father's lack of insight and the boys' "young and vulnerable ages, where they are unable to protect themselves from any abuse and/or neglect." The court found that father did not recognize appropriate boundaries with K., and stated, "I don't know that he would recognize it any better between [his] biological and non-biological" children. In

23

rejecting father's request for a home-of-parent order, the court stated that father's behavior with K. had been "percolating," and expressed concern that with respect to the younger children, father might have trouble "understanding what's in bounds and what's not in bounds." The court also stated that the biting incident "happened in front of one of [the younger] children. That's a cause for concern." When father's counsel noted that "the boys are attached to father," the court responded, "That doesn't allay the concern; it heightens it in many respects. Because it normalizes behavior that I found inappropriate."

Substantial evidence supports the court's detriment findings. Jurisdiction was appropriate for all three children, father failed to recognize inappropriate behavior with K., and father demonstrated a lack of insight regarding the concerns of DCFS and the court. (See, e.g., *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].) We therefore find no error in the court's order that D. and J. be removed from father's care.

    b.  Requirement that father's visitation be monitored

Father further contends that the juvenile court erred in requiring his visitation with D. and J. to be monitored. His argument relies on the same premise as the one above: that there was no evidence the boys would be at risk in father's unsupervised care. "The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1070.) Because the court's findings regarding a risk to the children were supported by substantial evidence, we find no

24

abuse of discretion in the court's order that father's visitation with D. and J. be monitored.

   c.   Order that father participate in sex abuse counseling for perpetrators

Finally, father contends that the juvenile court erred by ordering him to participate in sex abuse counseling for perpetrators, after the court did not sustain the allegations regarding sexual abuse.  Father asserts that "any case concerns regarding appropriateness and lack of proper boundaries could more than adequately be addressed in individual counseling addressing case concerns, coupled with parenting classes."  He also argues that "a finding that a parent's conduct necessitates participation in a sexual abuse class for perpetrators is pernicious and carries a particular stigma—namely, that the parent is a sexual predator."

A disposition order "may include a direction to participate in a counseling or education program, including, but not limited to, a parent education and parenting program . . . . The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (g).)  "However, when the court is aware of other deficiencies that impede the parent's ability to reunify with his child, the court may address them in the reunification plan."  (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008.)

Here, although the court held that father's inappropriate behavior with K. did not necessarily rise to the level of sexual abuse for purposes of finding jurisdiction, it was clearly concerned that father's treatment of K. may have included a sexual component.  Those concerns were supported by

substantial evidence. K. testified that one night while mother was away, she awoke to find that father was rubbing his hand up her leg to her buttock. K. also testified that father threw clothes on the floor to cause her to bend over to pick them up, and when she did so, he slapped her buttocks. Father looked at K. "from head to toe" in a way that made her uncomfortable, and maternal grandmother found father's slapping of K.'s buttocks to be concerning. At least some of this behavior occurred in the presence of the younger children, including the nighttime touching incident.

Moreover, father's concern about the "stigma" that may arise from his participation in a sexual abuse program for perpetrators is irrelevant. Father cites this court's opinion in *In re M.W.* (2015) 238 Cal.App.4th 1444, 1455-1456, in which we found that the evidence did not support a jurisdictional finding that the children's mother knew that the children's father had a history involving criminal sexual assault, and failed to protect the children from the father. Although we noted in that case that the allegations against the mother "carrie[d] a particular stigma" (*id*. at p. 1452), nothing in that opinion supports father's contention here, that the court should consider the "stigma" of participating in parental education programs of any type in fashioning a disposition order.

The juvenile court's disposition order was therefore supported by substantial evidence, and the visitation order did not constitute an abuse of discretion.

## B.    DCFS's appeal

DCFS asserts on appeal that the juvenile court erred in amending the petition to remove allegations of sexual abuse, and in sustaining the petition as amended. It asks that we reverse

the court's ruling and remand the case with directions to sustain the petition as originally alleged.  Father asserts that the evidence does not support a finding of sexual abuse.  We find that DCFS has not met the high burden required for a reversal.

In the juvenile court, DCFS had the burden of proof.  To establish a basis for jurisdiction, DCFS was required to prove by a preponderance of the evidence that the minor at issue was a person described by section 300.  (§ 355, subd. (a).)  Here, the court found that DCFS failed to meet that burden under section 300(d) and (j), and it met the burden under section 300(b)(1) only when the language in the petition was amended.

"[W]here the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals," the "question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.  [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved of on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989.)  Thus, the question before us is whether the juvenile court was compelled, as a matter of law, to sustain the petition as alleged under section 300(b)(1), (d), and (j).  We find it was not.

When father spoke to the CSWs and when he testified at the adjudication hearing, he denied slapping K.'s buttocks except for several slaps on a single occasion while they were playing tag.  Father also denied ever touching K. while she slept.  Father admitted the biting incident, but said that K. bit him during a

27

tussle over the television remote and denied pinning K. down. The juvenile court noted that the only evidence that was not in conflict was that there were "three to five slaps of this child's bottom," and the biting incident, for which "[s]ome of the essential facts are in dispute."

The court's identification of the evidence that was not in conflict appears to be supported by the record. This is the evidence that is "uncontradicted and unimpeached." (*In re I.W., supra,* 180 Cal.App.4th at p. 1528.) Although DCFS acknowledges the correct standard of review for its appeal, it nonetheless asserts that "father's conduct as consistently disclosed by [K.] supported jurisdiction" as alleged in the petition. However, given the procedural posture of the case before us, we may not presume that K.'s version of the events was entirely accurate.

Each of the three counts in the petition initially stated that father "sexually abused" K. "by slapping and fondling the child's buttocks," and by "rubb[ing] and fondl[ing] the child's leg to the child's buttocks." The petition further alleged that mother knew of the sexual abuse and failed to protect K., and that father's sexual abuse and mother's failure to protect endangered all three children. The uncontradicted and unimpeached evidence does not compel a finding that father sexually abused K.

Section 300(d) allows for an exercise of jurisdiction when a "child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code. . . ." Penal Code section 11165.1 states that "'sexual abuse' means sexual assault or sexual exploitation," and subdivision (b)(4) of that statute states, "Conduct described as 'sexual assault' includes, but is not limited

28

to . . . [t]he intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of a child, or of the perpetrator by a child, for purposes of sexual arousal or gratification . . . ."

Penal Code section 11165.1 also refers to Penal Code section 288, which bars "any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child."  (Pen. Code, § 288, subd. (a).)  Penal Code "[s]ection 288 is violated by 'any touching' of an underage child accomplished with the intent of arousing the sexual desires of either the perpetrator or the child."  (*People v. Martinez* (1995) 11 Cal.4th 434, 452.)  Penal Code section 11165.1 also refers to Penal Code section 647.6, subdivision (a)(1), which makes it a crime to "annoy[ ] or molest[ ] any child under 18 years of age."  Penal Code section 647.6 "does not require a touching [citation] but does require (1) conduct a "'normal person would unhesitatingly be irritated by'" [citations], and (2) conduct "'motivated by an unnatural or abnormal sexual interest'" in the victim."  (*People v. Lopez* (1998) 19 Cal.4th 282, 289.)

DCFS asserts that father's conduct constituted sexual abuse as defined in Penal Code sections 288 and 647.6.  It argues that father touching K.'s leg and buttocks must have been sexually motivated because "there could be no other purpose . . . than for sexual gratification."  It also contends that father slapped K.'s buttocks, and maintained a culture of secrecy about his behavior when he told K. not to tell anyone about the slaps and lied to mother about the bite mark on his shoulder.

29

We agree that father's behavior toward K. was concerning; indeed, it was an appropriate basis for jurisdiction over all three children. However, the uncontradicted and unimpeached evidence presented does not compel a finding of sexual abuse as a matter of law, in part because it does not support a finding that father had the requisite intent. DCFS has not cited any authority, and we have found none, to support a holding that such an inference is compelled as a matter of law based on the uncontradicted evidence in this case.

DCFS further argues that the trial court's error is demonstrated in its contradictory and confusing statements about its findings. On the one hand, the court seemed to base jurisdiction only on the evidence it found to be uncontradicted. When discussing whether disposition orders would address sexual abuse education in light of the amended petition, the court said, "I found disparities in both of their versions that made it may [*sic*] hard to reconcile, so I looked at the part where there wasn't a disparity, where there wasn't conflicting motives for their stories, and let's and [*sic*] reconcile to say, all right. Where has the burden been met?" DCFS asserts that this exchange indicates that "the juvenile court is basically saying it did not assess father's and [K.'s] credibility, weigh the evidence, or resolve conflicts in the evidence. [Citation.] Rather, it simply disregarded the conflicting evidence and based its jurisdictional findings on three to five slaps to [K.'s] buttocks that father admitted to."

DCFS points out that at other times, the court seemed to accept K.'s version of events. For example, in considering whether father's actions were "prolonged," the court stated that there had been "[o]ne touch to the leg and the buttocks, five slaps on the

30

buttocks, a touch – the biting incident and what actually transpired. I don't know if that's what the court had in mind in *I.J.* when it talked about prolonged." DCFS asserts that court's disposition order requiring father complete a sexual abuse program for perpetrators also shows that the court accepted K.'s version of events. Based on these statements, DCFS contends that it is "clear the jurisdictional findings do not reflect the juvenile court's assessment of the evidence."

We agree that the court's statements were contradictory at times, but confusing statements do not meet the high appellate burden applicable here. If K.'s statements were the only evidence before the court, and her version of events was uncontradicted and unimpeached, a different result might be warrant. But because father's testimony contradicted K.'s accounts, we cannot find that the evidence compelled, as a matter of law, a finding of jurisdiction under the petition as originally phrased.

DCFS further asserts, "Even if it were true that father's proven conduct did not rise to the level of sexual abuse, that would be no reason to not sustain count j-1." It contends that the juvenile court seemed to misunderstand the relevant standard, because it stated that it would not sustain the count under section 300(j) because it did not find sexual abuse. In stating its ruling from the bench, the court said that it did not believe that father's actions were sufficiently sexual in nature to warrant jurisdiction under section 300(d). The court then considered whether D. and J. were at risk, and said, "I think that there's a risk, but not the risk that is referenced in *I.J.*, which talks about a risk of sexual abuse, but a risk that he does not recognize that there's a point in the children's age when what he may think is

31

appropriate becomes something inappropriate. So with all of that considered, the court is going to dismiss the (j) count . . . ."

The court's statement could be read to reflect an incorrect understanding that a count under section 300(j) requires a finding that a sibling was sexually abused. But section 300(j) is not so limited; it states that jurisdiction over a child is appropriate when the "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." Thus, the court could have exercised jurisdiction over D. and J. under section 300(j), because it exercised jurisdiction over K. under section 300(b), and also found a substantial risk to D. and J.

Nevertheless, for the reasons discussed above, we do not find that the court was compelled as a matter of law to find jurisdiction over D. and J. under section 300(j) as that count was originally stated in the petition, which included allegations of sexual abuse. We therefore decline DCFS's request to remand the cause and order the court to find jurisdiction under the petition as alleged.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.                                          WILLHITE, J.


32